IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PROFESSIONAL VALUE INTERNET SERVICES, LLC,<br>        Plaintiff,<br><br>v.<br><br>CENTRAL RURAL ELECTRIC COOPERATIVE,<br>        Defendant. | Case No. CIV-21-00765-PRW |

# ORDER

Before the Court is Defendant Central Rural Electric Cooperative's Motion to Dismiss Counts 1–2 and 4–7 of Plaintiff Professional Value Internet Services, LLC's Second Amended Complaint (Dkt. 31). This matter is fully briefed, and for the reasons given below, the motion (Dkt. 31) is **GRANTED** in part and **DENIED** in part.

## *Background*[1]

Plaintiff Professional Value Internet Services, LLC ("ProValue") is an internet-services company based in Stillwater, Oklahoma. ProValue operates within approximately 6,000 square miles in north central Oklahoma and provides internet access to over 5,000 Oklahomans. Seeking to expand its internet services in rural communities, in 2011 ProValue entered into an agreement with Defendant Central Rural Electric Cooperative

---

[1] At this stage in the proceedings, the Court accepts the plaintiff's well-pleaded allegations as true. So this factual background reflects the plaintiff's account.

1

("CREC"), an Oklahoma rural electric cooperative providing electricity to customers in central Oklahoma. Under that agreement, CREC leased excess tower space to ProValue, and ProValue provided wireless and telecommunication access throughout CREC's service territory. ProValue and CREC agreed "to refrain from disclosing any customer lists, trade secrets or other confidential material to any party outside [their] agreement," and they further agreed "not to compete with their respective services" while the agreement was in force and for five years "after its expiration or termination."[2]

Over the years, and pursuant to the terms of their agreement, CREC advertised ProValue's services on its billboards and website, consolidated their customer billing, shared booth space with ProValue at conferences, and allowed ProValue to install equipment on CREC's towers. Throughout this time, CREC's social-media posts and promotional materials described its relationship with ProValue as a "partnership."

In late 2018, ProValue presented to the CREC board of directors ProValue's plan to transition from wireless-internet services to fiberoptic internet for its current and potential customers. This presentation identified new areas for fiberoptic services, and ProValue announced that it planned to utilize CREC's pole attachments for fiber access. CREC's board of directors supported the plan. In early 2019, ProValue hired a fiberoptics engineer to start researching and mapping out the fiberoptics project, and by the end of that year, ProValue ran its first fiberoptics from its Stillwater office to CREC's data center.

---

[2] Def's Mot. (Dkt. 31), Ex. 1 at 1.

After ProValue submitted a request to CREC to run its next fifty-five miles of fiberoptic cable, the parties discussed the proposed route. No issues or concerns were raised. But when ProValue purchased the equipment to begin running the cable, CREC put the project on hold; CREC claimed that it needed to replace the utility poles to which ProValue would attach cable. Later, in March 2020, CREC approached ProValue regarding its fiberoptics capabilities and a potential purchase of the company. The parties began negotiations, and CREC eventually proposed purchasing ProValue. Those negotiations stalled, however, and the parties made little progress towards the next fifty-five miles of fiberoptic cable.[3]

In September 2020, CREC announced on its website and social media that its board of directors had approved a "fiber build out."[4] And despite CREC's assurances to ProValue that it wasn't developing fiberoptic-internet services that would compete with ProValue, CREC announced on June 2, 2021, that it had begun "[m]ainline fiber construction" in October 2020 and that "the first of 18 fiber huts [had] been installed."[5] Two days later, CREC posted on social media that it was building a "Centranet fiber" network and that the project would take five to seven years to complete, and its website introduced "Centranet,

---

[3] ProValue alleges that the project's first five miles were not ready to begin until around September 2020, and as of filing the Second Amended Complaint, the next seven-mile phase was still incomplete. Pl.'s Second Am. Compl. (Dkt. 27), at 11.

[4] *Id.* ¶¶ 44–45.

[5] According to ProValue, the June 2 announcement was when it first learned that CREC had begun to construct a competing fiber-internet network.

a wholly-owned subsidiary of [CREC] dedicated to bringing [its] membership cutting-edge internet and phone services."[6]

These announcements prompted some of ProValue's customers to inquire about its affiliation with CREC's new fiber service. Some customers even switched to Centranet and continued to make service calls to ProValue, unaware that they were no longer ProValue customers. As late as July 28, 2021, more than a month after CREC announced its plans for a fiberoptic network, the electronic billboard in front of CREC's corporate offices advertised "high-speed rural internet" and encouraged customers to "add [ProValue] to [their] [CREC] bill."[7] Another advertisement displayed on the same billboard stated that "fiber is here" and encouraged customers to "check availability in [their] area" via Centranet's website.[8]

ProValue ultimately sued CREC for its subsidiary's rollout of fiberoptic internet services, alleging that CREC disclosed its trade secrets to Centranet and violated the parties' noncompete agreement. The Second Amended Complaint (Dkt. 27) asserts nine counts: (1) misappropriation of trade secrets under the federal Defend Trade Secrets Act; (2) misappropriation of trade secrets under the Oklahoma Uniform Trade Secrets Act; (3) unfair competition in violation of the Lanham Act; (4) deceptive trade practices under the Oklahoma Deceptive Trade Practices Act; (5) breach of contract; (6) tortious interference with prospective business or economic advantage; (7) unjust enrichment; (8) common-law

---

[6] *Id.* ¶¶ 54–55.

[7] *Id.* ¶ 56.

[8] *Id.* ¶ 57.

unfair competition; and (9) injunctive relief. CREC has moved to dismiss Counts 1–2 and 4–7 under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.

## *Legal Standard*

When reviewing a Rule 12(b)(6) motion to dismiss, "[a]ll well-pleaded facts, as distinguished from conclusory allegations,"[9] must be accepted as true and viewed "in the light most favorable to the plaintiff."[10] Parties bear the "obligation to provide the grounds of [their] entitle[ment] to relief," which requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[11] The pleaded facts must be sufficient to establish that the claim is plausible.[12] In considering whether a claim is plausible, the Court "liberally construe[s] the pleadings and make[s] all reasonable inferences in favor of the non-moving party."[13] Generally, a complaint will survive a Rule 12(b)(6) motion to dismiss if it "state[s] a claim to relief that is plausible on its face," meaning that it pleads sufficient facts to support a "reasonable inference that the defendant is liable for the misconduct alleged."[14]

---

[9] *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017).

[10] *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *David v. City & County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996)).

[11] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted) (alteration in original).

[12] *See id*.

[13] *Brokers' Choice of Am., Inc.*, 861 F.3d at 1105.

[14] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

*Discussion*

As mentioned above, CREC has moved to dismiss Counts 1–2 and 4–7 of the Second Amended Complaint.

I. *Counts 1 and 2: Misappropriation of Trade Secrets.*

CREC argues that ProValue has failed to state a claim for misappropriation of trade secrets under either federal or state law. Under these laws, a plaintiff asserting a misappropriation-of-trade-secrets claim must allege (as the name of the claim suggests) that the defendant "misappropriated" its trade secrets.[15] A trade secret can be "misappropriated" by either improper acquisition, unauthorized disclosure, or unauthorized use.[16]

ProValue asserts that CREC acquired trade secrets under the parties' agreement and then used them—through Centranet—"to mimic the exact fiberoptic rollout plans to the same ProValue customers and potential service areas that ProValue had privately shared with CREC."[17] But according to CREC, ProValue's allegations that Centranet (1) "targeted the same market area ProValue previously identified to CREC," (2) "invested in the same technology on a similar timeline as what ProValue previously proposed to CREC," and (3) "undercut ProValue's prices" do not support a plausible inference of misappropriation.[18]

---

[15] 18 U.S.C. § 1836(b)(1); *MTG Guarnieri Mfg., Inc. v. Clouatre*, 239 P.3d 202, 209 (Okla. 2010).

[16] 18 U.S.C. § 1839(5); Okla. Stat. tit. 78, § 86(2).

[17] Pl.'s Resp. (Dkt. 32), at 13.

[18] For the purposes of this motion, CREC doesn't challenge ProValue's assertion that its customer lists, lists of potential customers, customer preferences, pricing information, and internal financial data are "trade secrets" under federal and state law. *See* Def.'s Reply

Taking the Second Amended Complaint's allegations as true, and "mak[ing] all reasonable inferences in favor of the non-moving party,"[19] ProValue has stated a claim for misappropriation of trade secrets under federal and state law. ProValue alleges (1) that during the course of their business relationship, it disclosed to CREC its customer lists, lists of potential customers, customer preferences, pricing information, and internal financial data; (2) that it presented to CREC's board of directors "ProValue's plan to transition to fiberoptic internet for its residential customers and potential customers";[20] (3) that CREC then created a wholly owned subsidiary, Centranet, to venture into fiberoptic internet; and (4) that Centranet charted an identical course in rolling out fiberoptic internet to the same customers and potential customers, in the same geographic area, and for cheaper prices. These alleged facts are sufficient to support a "reasonable inference that the defendant"[21] misappropriated ProValue's trade secrets by disclosing them to Centranet (a nonparty to ProValue and CREC's agreement), and that Centranet used those trade secrets to launch a competing business. The Court thus denies CREC's motion with respect to Counts 1 and 2.

---

(Dkt. 35), at 2 ("As its motion makes clear, CREC is *not* arguing ProValue failed to adequately allege the *existence* of a trade secret (the first element of a trade secret claim) but rather the *misappropriation* of one (the second element).").

[19] *Brokers' Choice of Am., Inc.*, 861 F.3d at 1105.

[20] Pl.'s Second Am. Compl. (Dkt. 27), at 10.

[21] *Iqbal*, 556 U.S. at 678.

II.     *Count 4: Deceptive Trade Practices.*

Under Oklahoma law, "A person engages in a deceptive trade practice when in the course of business, vocation, or occupation, the person . . . [k]nowingly makes a false representation as to the source, sponsorship, approval, or certification of goods or services."[22] CREC argues that ProValue's deceptive-trade-practices claim "is devoid of any well-pleaded factual allegations and, thus, fails to state a claim."[23] This is so, says CREC, because "[n]ot only does ProValue fail to allege any facts regarding the falsity of the representations at issue or CREC's knowledge of the falsity of representations, *it does not even identify the challenged representations.*"[24]

ProValue responds that the Second Amended Complaint contains specific allegations of CREC's deceptive trade practices:[25]

- On June 2, 2021, CREC shared in an annual report that "fiber construction began in October in the Stroud, Perkins and Stillwater areas."[26]

- On June 4, 2021, CREC posted on Facebook that "[w]e know you're excited to get Centranet fiber at your home."[27]

- CREC announced on its website that its wholly owned subsidiary, Centranet, would "bring[] [CREC's] membership . . . *high-speed internet* and phone capabilities."[28]

---

[22] Okla. Stat. tit. 78, § 53(A)(2).

[23] Def.'s Mot. (Dkt. 31), at 8

[24] *Id.* (emphasis in original).

[25] *See* Pl.'s Resp. (Dkt. 32), at 17 (citing ¶¶ 53–58 of the Second Amended Complaint).

[26] Pl.'s Second Am. Compl. (Dkt. 27), ¶¶ 50, 53.

[27] *Id.* ¶¶ 52, 53.

[28] *Id.* ¶ 54 (emphasis added).

- A CREC advertisement stated that "high-speed rural internet" was available from *ProValue* and that customers could add ProValue to their CREC bill.[29]

- And another advertisement directed customers seeking fiberoptic internet to visit the Centranet website.[30]

ProValue contends that, through these communications and advertisements, CREC knowingly and falsely represented that ProValue was the source of Centranet's fiberoptic internet. This is bolstered by the fact, as ProValue alleges, that CREC's communications and advertisements caused some of ProValue's customers to inquire about its affiliation with Centranet, and that some even switched to Centranet and continued making service calls to ProValue, unaware that they were no longer ProValue customers.

But according to CREC, ProValue's allegations are conclusory and don't point to any false representations. This is because the individual advertisements, viewed in isolation, contained the truth: The first advertisement stated that CREC customers could add ProValue to their bill, and the second advertisement stated that "fiber is here." Further, CREC argues, ProValue doesn't allege facts regarding whether the advertisements ran in close temporal proximity, how many customers called ProValue, when ProValue received the calls, and why those customers were confused. So, "[w]ithout these basic facts, one cannot plausibly infer CREC ran these advertisements in such a way as to intentionally

---

[29] *Id.* ¶ 56.
[30] *Id.* ¶ 57.

mislead consumers into believing that ProValue was the source of Centranet's fiberoptic internet."[31]

The Court concludes that, taken as a whole, the Second Amended Complaint contains allegations supporting a plausible inference that CREC knowingly and falsely represented ProValue was the source of Centranet's fiberoptic internet.[32] ProValue alleges that on June 2, 2021, CREC began a series of online communications and advertisements that lasted until at least July 28, 2021. In those months, CREC allegedly promoted "high-speed internet" from Centranet, "high-speed rural internet" from ProValue, and fiberoptic internet from Centranet. Combined with ProValue's assertion that more than a few customers expressed confusion about the fiberoptic internet's source, the Second Amended Complaint provides adequate notice about the nature of the deceptive-trade-practices claim. The Court thus denies CREC's motion with respect to Count 4.

III. *Count 5: Breach of Contract.*

ProValue alleges that CREC breached the parties' 2011 agreement in two ways: (1) by competing with ProValue for internet services within the relevant service market and (2) by disclosing ProValue's trade secrets and confidential information. CREC challenges both theories.

---

[31] Def.'s Reply (Dkt. 35), at 4.

[32] Even under a heightened pleading standard, knowledge and intent may be alleged generally. *See* Fed. R. Civ. P. 9(b).

   1. *Noncompete Provision.*

As to the first theory, CREC argues that the 2011 agreement's noncompetition provision is unenforceable under Oklahoma law. In Oklahoma, noncompetition agreements are void except under limited statutory exceptions.[33] The first exception (inapplicable here) is for "[o]ne who sells the goodwill of a business."[34] And the second depends on the existence of a partnership.[35] A partnership has three essential elements: "(1) an intent by the parties to form a partnership, (2) participation by all parties in both profits and losses, and (3) such a community of interest as far as third persons are concerned as enables each partner to make contracts, manage the business and dispose of partnership property."[36]

CREC contends that it and ProValue were never "partners" and that ProValue "fail[s] to allege any of the essential elements of a partnership."[37] ProValue doesn't fully respond to this argument. And upon review of the Second Amended Complaint, the Court agrees with CREC that ProValue fails to allege the essential elements. Take just the second

---

[33] *See* Okla. Stat. tit. 15, § 217 ("Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title, or otherwise than as provided by Section 2 of this act, is to that extent void.").

[34] Okla. Stat. tit. 15, § 218.

[35] Okla. Stat. tit. 15, § 219 ("Partners may, upon or in anticipation of a dissolution of the partnership, agree that none of them will carry on a similar business within a specified county and any county or counties contiguous thereto, or a specified city or town or any part thereof.").

[36] *Crest Const. Co. v. Ins. Co. of N. Am.*, 417 F. Supp. 564, 568 (W.D. Okla. 1976) (citing *Dowdy v. Clausewitz*, 361 P.2d 288 (Okl.1961)).

[37] Def.'s Mot. (Dkt. 31), at 9.

element of a partnership: Nowhere in the Second Amended Complaint does ProValue allege "participation by all parties in both profits and losses."[38] Because ProValue hasn't alleged the essential elements of a partnership, it may not invoke the partnership exception under Oklahoma law to save the noncompete provision.

Rather than responding to CREC's partnership argument, ProValue instead asserts that Oklahoma law "prohibits only *unreasonable* restraints on the exercise of a lawful profession, trade, or business"[39] and that "contracts in restraint of trade must be determined by [their] reasonableness *in view of the particular circumstances*."[40] Horizontal restraints are *per se* unreasonable, whereas vertical restraints are not.[41] A "vertical restraint" is a "restraint not to compete between two parties operating on different market levels,"[42] such as a manufacturer and a distributor or a wholesaler and a retailer. By contrast, a horizontal restraint involves an agreement not to compete between competitors or—as relevant here—potential competitors at the same market level.[43]

---

[38] Because ProValue doesn't allege that it and CREC shared profits and losses, it's unnecessary for the Court to determine whether the parties intended to form a partnership.

[39] Pl.'s Resp. (Dkt. 32), at 18 (quoting *Bayly, Martin & Fay, Inc. v. Pickard*, 780 P.2d 1168, 1172 (Okla. 1989)) (emphasis in ProValue's response).

[40] *Id.* at 19 (quoting *Bd. of Regents of Univ. of Oklahoma v. Nat'l Collegiate Athletic Ass'n*, 561 P.2d 499, 508 (Okla. 1977)) (emphasis in ProValue's response).

[41] *Crown Paint Co. v. Bankston*, 640 P.2d 948, 950–51 (Okla. 1981)).

[42] *Id.*

[43] *See id.* at 950. *Cf. United States v. Davita Inc.*, No. 1:21-CR-00229-RBJ, 2022 WL 1288585, at *2 (D. Colo. Mar. 25, 2022) ("Market allocation agreements between horizontal competitors—actual or potential competitors at the same level of the market structure—are per se unreasonable restraints of trade . . . ."); *Transource Int'l, Inc. v. Trinity*

As ProValue notes, "[v]ertical restraints must be evaluated by the 'rule of reason'" and "in view of the particular circumstances."[44] But ProValue hasn't alleged any facts indicating that it and CREC were ever in a vertical relationship. Indeed, the parties are not vertically aligned at different levels of the same market; they provide services at the same level (retail) and in different markets (CREC in electricity, ProValue in internet). ProValue has alleged a horizontal relationship between *potential* competitors,[45] so the parties' noncompete provision is *per se* unreasonable under Oklahoma law. The Court thus concludes that the provision is unenforceable and that this breach-of-contract theory should be dismissed.

    2. *Disclosure of Trade Secrets and Confidential Information.*

ProValue also alleges that CREC breached the parties' 2011 agreement by disclosing ProValue's trade secrets and confidential information to Centranet, a nonparty to the agreement. Under the parties' agreement, they were "to refrain from disclosing any customer lists, trade secrets or other confidential material to any party outside [their]

---

*Indus., Inc.*, 725 F.2d 274, 280 (5th Cir. 1984) ("[A]greements not to compete among potential competitors are . . . illegal per se.").

[44] Pl.'s Resp. (Dkt. 32), at 19–20.

[45] In arguing that ProValue and CREC were not horizontal competitors, ProValue states that "as a rural electric cooperative, CREC likely had no statutory authority to engage in any business *other than* electric power." Pl.'s Resp. (Dkt. 32), at 20 n.2 (citing Okla. Stat. tit. 18, § 437.2(d)). But whether an entity is statutorily *authorized* to engage in a business is a different question from whether it could nevertheless compete with other businesses *ultra vires*. So, even if ProValue is correct that CREC has no authority to directly enter the internet-services market, that isn't dispositive on whether CREC (or its wholly owned subsidiary, Centranet) was a potential competitor when entering into the noncompete agreement.

agreement."[46] For the reasons given above with respect to ProValue's misappropriation-of-trade-secrets claims, the Court denies CREC's motion as to this alleged theory of breach.

IV.     *Count 6: Tortious Interference with Prospective Business or Economic Advantage.*

CREC argues that ProValue's tortious-interference claim should be dismissed for lack of supporting factual allegations. To state a claim for tortious interference with a prospective business or economic advantage, a plaintiff must allege

1. the existence of a valid business relation or expectancy,

2. knowledge of the relationship or expectancy on the part of the interferer,

3. an intentional interference inducing or causing a breach or termination of the relationship or expectancy, and

4. resultant damage to the party whose relationship has been disrupted.[47]

This claim "usually involves interference with some type of reasonable expectation of profit,"[48] and "[t]here is no actionable claim if the interference is lawful or does not encompass any unfair or unlawful act."[49]

According to CREC, ProValue doesn't allege facts supporting any of the required elements. CREC also asserts that because ProValue doesn't enter into contracts with its customers, ProValue's customers are "free to conduct business with whomever" they wish

---

[46] Def.'s Mot. (Dkt. 31), Ex. 1 at 1.

[47] *Batton v. Mashburn*, 107 F. Supp. 3d 1191, 1198 (W.D. Okla. 2015) (citing *Brock v. Thompson*, 948 P.2d 279, 293 n.58 (Okla. 1997)). *See Loven v. Church Mut. Ins. Co.*, 2019 OK 68, ¶ 21, 452 P.3d 418, 425.

[48] *Overbeck v. Quaker Life Ins. Co.,* 757 P.2d 846, 847–48 (Okla.Civ.App.1984).

[49] *Brock*, 948 P.2d at 293 n.59.

and ProValue thus had no "contractual or business right with its customers."[50] ProValue responds that CREC has mischaracterized the claim as "tortious interference *with contract*" rather than tortious interference with a prospective business or economic advantage, and that ProValue "had a reasonable expectation of continued profit from its relationships with its current customers even in the absence of a formal contract."[51] But as CREC notes it its reply, ProValue addresses only the first element of its tortious-interference claim and doesn't respond to CREC's broader argument that ProValue hasn't alleged facts supporting *any* of the required elements. Even so, the Court has reviewed the Second Amended Complaint and concludes that ProValue has stated a tortious-interference claim.[52]

ProValue has alleged facts supporting each element of a claim for tortious interference with a prospective business or economic advantage. First, ProValue alleges it had "a reasonable and valid expectation" that it would profit from both its current and

---

[50] Def.'s Mot. (Dkt. 31), at 10–11 (quoting *Joint Tech., Inc. v. Weaver*, No. CIV-11-846-M, 2011 WL 6888633, at *1 (W.D. Okla. Dec. 29, 2011)).

[51] Pl.'s Resp. (Dkt. 32), at 22. *See Overbeck v. Quaker Life Ins. Co.*, 757 P.2d 846, 847–48 (Okla. Civ. App. 1984) ("Although both torts do have similarities, the underlying theories of liability differ. Interference with a prospective economic advantage usually involves interference with some type of reasonable expectation of profit, whereas interference with a contractual relationship results in loss of a property right.").

[52] *Cf. Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003) ("[E]ven if a plaintiff does not file a response to a motion to dismiss for failure to state a claim, the district court must still examine the allegations in the plaintiff's complaint and determine whether the plaintiff has stated a claim upon which relief can be granted."); 5B Wright & Miller, *Fed. Prac. & Proc. Civ.* § 1357 (3d ed., April 2023 update) ("Most federal courts will not grant a motion to dismiss for failure to state a claim only because the nonmoving party failed to respond to the motion. The court is still required to conduct the Rule 12(b)(6) inquiry to determine if the complaint states a valid claim for relief.") (citing *Fournerat v. Wis. L. Rev.*, 420 F. App'x 816 (10th Cir. 2011)).

potential customers: ProValue "had extensive plans to begin servicing new areas with fiber internet service—plans ProValue shared with CREC under the protections of the Agreement"—and "invested extensively in the assets necessary to bring fiber internet to these new areas."[53] Second, ProValue alleges that "CREC had knowledge of ProValue's expectations as to its current and prospective relationships by numerous means, including but not limited to CREC's access to ProValue's trade secrets" and other confidential information.[54] Third, ProValue alleges that CREC has intentionally used ProValue's trade secrets and confidential information "to preempt ProValue's fiber service plans" and engaged in "deceptive advertising" to "solicit[] and redirect[] ProValue's customers and potential customers to CREC's now-competing subsidiary," Centranet.[55] According to ProValue, CREC has "caused over 500 customers to cease their relationships with ProValue and to switch to Centranet."[56] And fourth, ProValue alleges that it has been damaged by the loss of current and potential customers.[57]

For those reasons, the Court denies CREC's motion with respect to ProValue's tortious-interference claim.

---

[53] Pl.'s Second Am. Compl. (Dkt. 27), ¶¶ 95–96.

[54] *Id.* ¶ 97.

[55] *Id.* ¶ 98.

[56] *Id.*

[57] *Id.* ¶ 101.

16

V.    *Count 7: Unjust Enrichment.*

Lastly, CREC asks the Court to dismiss ProValue's unjust-enrichment claim because it has an adequate remedy at law. The Federal Rules of Civil Procedure permit a party to "state as many separate claims or defenses it has, regardless of consistency."[58] And "Oklahoma procedure clearly permits pleading alternative remedies, just as it allows alternative theories of recovery, as long as plaintiffs are not given double recovery for the same injury."[59] But when "an enforceable express contract regulates the relations of the parties with respect to the disputed issue," and when "the claim . . . is grounded in the parties' contractual relationship," quasi-contractual remedies like unjust enrichment "are not to be created."[60]

CREC recognizes that "plaintiffs can, in certain circumstances, maintain an unjust enrichment claim in alternative to other legal causes of action."[61] It argues, however, that because "an enforceable express contract governs the parties' relationship," ProValue may

---

[58] Fed. R. Civ. P. 8(d)(3).

[59] *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1030 (10th Cir. 2007) (quoting *N.C. Corff P'ship, Ltd. v. OXY USA, Inc.*, 929 P.2d 288, 295 (Okla. Civ. App. 1996)).

[60] *Parrish v. Arvest Bank*, 717 F. App'x 756, 765 (10th Cir. 2017) (quoting *Member Serv. Life Ins. Co. v. Am. Nat'l Bank & Tr. Co. of Sapulpa*, 130 F.3d 950, 957 (10th Cir. 1997) and *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1107–09 (10th Cir. 2005)) (emphasis added). *See Am. Biomedical Grp., Inc. v Techtrol, Inc.*, 374 P.3d 820, 828 (Okla. 2016) ("[A] party is not entitled to pursue a claim for unjust enrichment when it has an adequate remedy at law for breach of contract."). The Court cites unpublished decisions of the Tenth Circuit for their persuasive value, consistent with Tenth Cir. R. 32.1 and Fed. R. App. P. 32.1.

[61] Def.'s Reply (Dkt. 35), at 9.

not plead an unjust-enrichment claim in the alternative.[62] True, the parties' agreement regulates their relationship with respect to *one* disputed issue (CREC's alleged disclosure of trade secrets and confidential information).[63] But ProValue pleads its unjust-enrichment claim in the alternative to its various other claims, not just its claim for breach of contract.[64] And not every claim is "grounded in the parties' contractual relationship."[65] At the motion-to-dismiss stage, moreover, "Oklahoma federal courts consistently decline to dismiss alternative theories and requests for relief."[66] So, "while [ProValue] will not be permitted

---

[62] Def.'s Reply (Dkt. 35), at 9 (quoting *Naylor Farms, Inc. v. Anadarko OGC Co.*, 2011 WL 7267851, at *1 (W.D. Okla. June 15, 2011)).

[63] But even then, ProValue's unjust-enrichment claim seeks to "disgorge any wrongful gain," *id.* ¶ 105, and "[CREC] [does] not contend that [ProValue] would be entitled to disgorgement of profits under the Agreement," *Brown v. Kruger Fam. Holdings II, LLC*, No. 19-CV-00048-GKF-JFJ, 2019 WL 4061677, at *6 (N.D. Okla. Aug. 28, 2019).

[64] Pl.'s Second Am. Compl. (Dkt. 27), ¶¶ 104–05 ("CREC's unlawful competition, tortious interference, and deceptive trade practices have enabled it to wrongfully profit and advance its business interest by the use of ProValue's trade secrets, confidential material, and proprietary information at ProValue's expense. . . . As a result, and to the extent ProValue has no redress under the Agreement or other remedy at law, CREC has been unfairly and unjustly enriched . . . .").

[65] *See Parrish*, 717 F. App'x at 765. For example, the parties' agreement doesn't regulate the dispute alleged in ProValue's deceptive-trade-practices claim: That claim depends on a "[k]nowingly . . . false representation as to the source, sponsorship, approval, or certification of goods or services," not the existence of an express contract. *See* Okla. Stat. tit. 78, § 53(A)(2).

[66] *ASI Constr., LLC v. City of Oklahoma City*, No. CIV-21-01138-JD, 2023 WL 4305131, at *4 (W.D. Okla. June 30, 2023) (rejecting similar argument) (quoting *Kunneman Props., LLC v. Marathon Oil Co.*, 17-CV-00456-GKF-JFJ, 2019 WL 4658362, at *8 (N.D. Okla. Sept. 24, 2019)).

to receive double recovery, . . . [it] will be permitted to pursue these alternative theories of recovery and seek both legal and equitable relief at this stage."[67]

*Conclusion*

For the reasons given above, CREC's motion to dismiss (Dkt. 31) is **GRANTED** in part and **DENIED** in part. Because the 2011 agreement's noncompetition provision is unenforceable under Oklahoma law, the Court **DISMISSES** ProValue's breach-of-contract claim based on an alleged breach of that provision.

**IT IS SO ORDERED** this 14th day of July 2023.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

---

[67] *See Brown*, 2019 WL 4061677, at *6 (quoting *Hitch Enters., Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249, 1258 (W.D. Okla. 2012)); *see also Murrah v. EOG Res., Inc.*, No. CIV-10-994-M, 2011 WL 227652, at *3 (W.D. Okla. Jan. 21, 2011) ("[A] party may allege an equitable claim as an alternative to a contract-based claim so long as the party is not permitted double recovery on the same injury."); *Reirdon v. Cimarex Energy Co.*, No. CIV-16-445-SPS, 2017 WL 4295188, at *3 (E.D. Okla. Sept. 27, 2017) (same); *Balfour v. Griswold*, No. CIV-22-1051-J, 2023 WL 3269701, at *3 (W.D. Okla. Mar. 2, 2023); *ASI Constr., LLC*, 2023 WL 4305131, at *4 ("Though Plaintiff will not be permitted to receive double recovery and resolution of the contract claim may ultimately make equitable relief inappropriate, Plaintiff is permitted to pursue alternative theories of recovery and seek both legal and equitable relief at this stage.").